UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

UNITED STATES OF AMERICA    )
    )
       v.    )    No. 1:16-cr-00130-JAW-1
    )
JAMIE AKERSON    )

**ORDER ON MOTION FOR COMPASSIONATE RELEASE**

An inmate serving a one hundred sixty-month sentence for his role as the leader of a conspiracy to distribute and possess with intent to distribute one kilogram or more of heroin moves for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A). The Court concludes that the inmate has failed to carry his burden of proving extraordinary and compelling reasons warranting release, and the seriousness of his offense, the relatively short time he has served, and the need for the sentence served to fulfill the sentence imposed preclude his release. The Court dismisses the motion without prejudice.

## I.    PROCEDURAL BACKGROUND

On April 14, 2017, Jamie Akerson pleaded guilty to conspiracy to distribute and possess with intent to distribute one kilogram or more of heroin in violation of 21 U.S.C. §§ 846 and 841(a)(1). *Min. Entry* (ECF No. 87). On October 15, 2018, the Court sentenced Mr. Akerson to one hundred sixty months of imprisonment, five years of supervised release, and a $100 special assessment. *Min. Entry* (ECF No. 155); *J.* (ECF No. 158).

On February 11, 2021, Mr. Akerson filed a pro se motion for compassionate release. *Mot. for Compassionate Release* (ECF No. 180) (*Def.'s Pro Se Mot.*). The next

day, the Court appointed counsel for Mr. Akerson. *Appointment of Counsel & Scheduling Order* (ECF No. 182). After an extension of time, Mr. Akerson filed an amended motion for compassionate release on February 26, 2021. *Def.'s Am. Pet. for Compassionate Release* (ECF No. 190) (*Def.'s Mot.*). On March 11, 2021, the Government responded in opposition. *Gov't's Opp'n to Def.'s Mot. for Compassionate Release re: First Step Act* (ECF No. 194) (*Gov't's Opp'n*). Mr. Akerson replied on March 15, 2021. *Def.'s Reply to Gov't's Opp'n to Def.'s Am. Pet. for Compassionate Release* (ECF No. 195) (*Def.'s Reply*).

On April 8, 2021, the Court ordered Mr. Akerson to answer six questions regarding his vaccination status: "(1) has a vaccination been offered to Mr. Akerson, (2) did he accept the vaccination, (3) when was he vaccinated, (4) has he received one or two vaccinations, (5) if he is fully vaccinated, when did he become fully vaccinated, and (6) if he refused the vaccination, why." *Order* (ECF No. 199). On April 20, 2021, Mr. Akerson responded, informing the Court that he received the first dose of the Pfizer vaccine on March 30, 2021 and was due to receive his second dose on April 20, 2021. *Def.'s Resp. to Court's April 8, 2012 Order on Am. Pet. for Compassionate Release* (ECF No. 200) (*Vaccine Status Update*).

## II.    FACTUAL BACKGROUND

The Court draws much of this factual background from Mr. Akerson's Revised Presentence Investigation Report (PSR). *See Restricted U.S. Probation Filing*, Attach. 3, *PSR* (ECF No. 183). Mr. Akerson did not object to the contents of the PSR either before or at his sentencing hearing and the Court adopted the PSR without

change and relied on it to sentence Mr. Akerson.  *See PSR* Addendum to the Presentence Report at 28; *compare PSR* ¶¶ 18-28, 52, 84, *with Statement of Reasons* at 1 (ECF No. 159).

### A.    Criminal History

Mr. Akerson's criminal history is extensive.  Between 1980 and 2001, he was convicted thirteen times in Connecticut state court for offenses including reckless endangerment, threatening, possession of marijuana, larceny, failure to appear, and escape.  *PSR* ¶¶ 30-42.  The Probation Office (PO) requested information about these convictions from state of Connecticut authorities but had not received any information by the date of the sentencing hearing.  *Id.*  Due to their age, the PO assigned no criminal history points to these offenses.   The Court turns to Mr. Akerson's more recent convictions.

On July 10, 2003, Mr. Akerson was sentenced by the Enfield, Connecticut Superior Court to four years of imprisonment with twelve months to serve, and three years' probation for assault.  *Id.* ¶ 43.  On June 24, 2005, he was sentenced to two years of imprisonment for a probation violation.  *Id.*  That same day, Mr. Akerson was sentenced by the Enfield Superior Court to one year of imprisonment for "Evading – Injury/Property."  *Id.* ¶ 44.  According to the incident report, a witness observed a large vehicle driven by Mr. Akerson weave from lane to lane passing cars, swerve into oncoming traffic, strike a woman's vehicle, and then speed off.  *Id.*

On June 24, 2005, Mr. Akerson was also sentenced by the Enfield Superior Court for three different larceny and failure to appear convictions.  First, he was

sentenced to ninety days' imprisonment for larceny concurrent with one year of imprisonment for failure to appear after a loss prevention officer at a department store observed Mr. Akerson conceal two boxes of perfume, valued at $97.50, and exit the store without paying for them. *Id.* ¶ 45. Second, he was sentenced to ninety days' imprisonment for larceny concurrent with one year of imprisonment for failure to appear after a loss prevention officer at a department store observed Mr. Akerson take two Clinique gift sets, valued at $208.50, off the rack and exit the store without paying for them. *Id.* ¶ 46. Finally, he was sentenced to three years of imprisonment for third degree larceny, but no further information is available concerning the offense conduct. *Id.* ¶ 47.

Mr. Akerson was convicted of several other larceny and theft crimes. On August 16, 2005, Mr. Akerson was sentenced by the New Britain, Connecticut Superior Court to ninety days' imprisonment for larceny. *Id.* ¶ 48. According to the incident report, the manager of a convenience store saw Mr. Akerson run out of the store carrying a basket containing cans of baby formula and leave the scene in a pickup truck. *Id.* On December 9, 2008, Mr. Akerson was sentenced to thirty months' imprisonment by the Enfield Superior Court for third degree larceny. *Id.* ¶ 49. According to the application for an arrest warrant, the owner of an automotive repair business noticed that one of his vehicles was missing; a review of the surveillance system revealed a tow truck belonging to a towing company in Enfield, Connecticut, leaving the premises with a 1990 Dodge Ram truck valued at approximately $2,500. *Id.* The owner of the towing company indicated that Mr. Akerson, an employee of the

company, was the driver of the tow truck and indicated that Mr. Akerson did not return to pick up his paycheck and attempts to contact him were unsuccessful. *Id.* Finally, on November 24, 2010, Mr. Akerson was sentenced to two days' imprisonment and a $300 fine for theft and two days imprisonment for criminal trespassing. *Id.* ¶ 50. According to the incident report, Mr. Akerson tried to remove eighty-nine pounds of copper valued at $229 from a scrap yard. *Id.*

Most recently, on May 21, 2013, Mr. Akerson was convicted before the Penobscot Judicial Center, Bangor, Maine for a driving violation but no further information is available, and the PO assigned no criminal history points to the offense. *Id.* ¶ 51.

The PO found that Mr. Akerson was a criminal history category VI, the highest criminal history category available under the United States Sentencing Guidelines. *Id.* ¶ 52. At the sentencing hearing, the Court concluded that Mr. Akerson was a criminal history category VI. *Statement of Reasons*, Attach. 1, *Findings Affecting Sentencing* ¶ 8.

### B.    Offense Conduct

The investigation into the Akerson-Shorey drug trafficking conspiracy began in 2015, when the U.S. Department of Justice, Drug Enforcement Administration (DEA) started investigating the drug trafficking activities of Don Grace. *Id.* ¶ 6. At the direction of DEA agents, a confidential source (CS-1) purchased heroin from Mr. Grace on six occasions between August 28, 2015 and January 7, 2016. *Id.*

On October 29, 2015, Massachusetts State Police stopped Holly Grant for speeding. *Id.* ¶ 7. An investigation revealed Ms. Grant did not have a valid driver's license and was driving a vehicle registered to Todd Shorey. *Id.* A search of the vehicle revealed approximately three hundred grams of heroin. *Id.* According to CS-1, Ms. Grant made the trip to Connecticut for Mr. Shorey to pick up heroin and was stopped by police on her way back to Maine. *Id.*

In December 2015, DEA agents learned that Mr. Grace was making weekly trips to Connecticut and on each trip he picked up approximately $15,000 worth of heroin. *Id.* ¶ 8. They believed Jamie Akerson was the leader of the drug trafficking organization, and Mr. Grace was working with Mr. Shorey and Mr. Akerson to obtain heroin from an out-of-state supplier. *Id.* DEA agents initiated electronic surveillance of Mr. Grace's cellphone and in January 2016, Maine State Police troopers stopped a vehicle with Mr. Grace in the backseat. *Id.* A search of the vehicle revealed three hundred thirty grams of heroin, and Mr. Grace was arrested. *Id.* A review of Mr. Grace's cellphone records showed there were two hundred thirty-four contacts by a telephone subscribed to Mr. Akerson and two hundred twenty-nine contacts by two telephones subscribed to Mr. Shorey. *Id.* ¶ 9.

On January 25, 2016, law enforcement officers attempted to interview Mr. Akerson at his residence in Pittsfield, Maine, but he stated he did not know anything and requested to speak with a lawyer. *Id.* That same day, officers went to Mr. Shorey's residence in Newport, Maine to interview him. *Id.* When agents approached the front door, they observed Mr. Shorey standing at the top of the stairs

with a firearm in his possession but not pointed at the officers. *Id.* Once the officers identified themselves, Mr. Shorey dropped the weapon. *Id.* When questioned, Mr. Shorey indicated that Mr. Akerson had "pistol-whipped" him in the head, and he showed agents a scar on top of his head. *Id.* When questioned regarding drug trafficking activities, Mr. Shorey asked to speak with a lawyer. *Id.*

Two confidential sources provided grand jury testimony. A cooperating defendant (CD) stated that in August 2015, he was introduced to Mr. Shorey for the purpose of obtaining heroin and helping Mr. Shorey "move" heroin. *Id.* ¶ 10. After the introduction, CD started obtaining heroin from Mr. Shorey on a regular basis, initially obtaining ten or fifteen bags per day. *Id.* Over time, CD received more heroin from Mr. Shorey, obtaining about seven hundred or eight hundred grams of heroin. *Id.* CD got the heroin by calling Mr. Shorey and then meeting Mr. Shorey at Mr. Shorey's residence. *Id.* While at Mr. Shorey's house, CD met Mr. Akerson, and based on comments made by Mr. Akerson, CD understood that Mr. Shorey was dealing heroin for Mr. Akerson. *Id.* CD was also aware of a couple people who rode with Mr. Shorey to Connecticut to help Mr. Shorey transport the heroin from Connecticut to Maine. *Id.*

After Ms. Grant's arrest, Mr. Shorey stopped dealing heroin for Mr. Akerson, and shortly thereafter, CD started selling heroin for Mr. Akerson. *Id.* The initial pick-up occurred in the Lewiston/Augusta area and involved three hundred grams of heroin. *Id.* Subsequently, CD started traveling to Connecticut where he met an individual known as "Templer" and provided money for heroin to take back to Maine.

*Id.* Each of the six trips CD made involved three hundred thirty grams of heroin for a total of 1,980 grams of heroin, which he obtained for $15,000. *Id.* Each week, CD provided Mr. Akerson with between $20,000 and $25,000 in drug proceeds, some of which Mr. Akerson presumably used to purchase a snowmobile, a box trailer, and a Harley Davidson motorcycle. *Id.* CD also stated that he observed firearms at Mr. Shorey's house, and Mr. Akerson indicated that the majority of those firearms belonged to Mr. Akerson. *Id.*

A second confidential source (CS-2) stated that he met Mr. Shorey in May 2015 and shortly thereafter essentially moved into Mr. Shorey's residence. *Id.* ¶ 11. Mr. Shorey introduced CS-2 to Mr. Akerson, who provided CS-2 with several bundles of heroin. *Id.* In June 2015, Mr. Akerson and Mr. Shorey purchased a vehicle used by CS-2 and Mr. Shorey to travel out-of-state to meet Templer to obtain heroin. *Id.* Between May and October 2015, CS-2 made about fifty trips with Mr. Akerson or Mr. Shorey to obtain heroin from Templer, obtaining between one hundred and three hundred grams, for a low-end estimate of five thousand grams of heroin. *Id.* CS-2 also testified that Mr. Shorey used some of the drug proceeds to buy firearms for Mr. Akerson because Mr. Akerson was unable to purchase firearms due to his felony convictions. *Id.* Mr. Akerson and Mr. Shorey shot the firearms in a lot behind Mr. Shorey's residence, and Mr. Shorey usually sat with a handgun on the armrest of a chair in case someone tried to steal the heroin. *Id.* On one occasion, CS-2 observed Mr. Akerson hit Mr. Shorey in the back of his head with a handgun, in part, because Mr. Shorey had someone at his residence who owed Mr. Akerson money. *Id.*

The investigation revealed that from about May 1, 2015 until January 25, 2016, Mr. Akerson conspired with others to distribute one kilogram or more of heroin. *Id.* ¶ 12. Mr. Akerson obtained the heroin from an out-of-state source, packaged it in "bundles" of ten small bags containing one-tenth gram of heroin per bag, and with Mr. Shorey and others, transported the heroin to central Maine for distribution. *Id.* Mr. Akerson collected the drug proceeds and used them to purchase more heroin. *Id.* In this way, the conspiracy obtained and distributed thousands of bags of heroin per week. *Id.*

With respect to drug quantity, the PO concluded that Mr. Akerson was responsible for a total of 8.28 kilograms of heroin. *Id.* ¶ 13. To avoid potential double counting, the PO did not hold Mr. Akerson accountable for any heroin obtained during the controlled purchases. *Id.*

### C.   Guideline Calculations

As a result of his criminal history and offense conduct, the Court determined that Mr. Akerson was a Criminal History Category VI with a Total Offense Level of 37. *Statement of Reasons* at 1. The applicable sentencing guideline range was three hundred sixty months to life imprisonment, five years of supervised release, and a fine between $40,000 and $10,000,000. *Id.* The Court departed below the guideline range and sentenced Mr. Akerson to one hundred sixty months of incarceration, five years of supervised release, and a $100 special assessment. *Id.* at 2; *J.* at 2-7.

### III.    THE PARTIES' POSITIONS

#### A.    Jamie Akerson's Motion

Mr. Akerson requests compassionate release "due to heightened COVID-19 risks associated with [his] multiple comorbidities." *Def.'s Mot.* at 1.  He first states that he fully exhausted his administrative remedies on November 10, 2020 when the Warden of FCI Otisville denied his request for compassionate release.  *Id.* at 3. Turning to the merits, he argues that prison inmates with certain medical conditions cannot social distance and are "sitting ducks" should they be exposed to COVID-19. *Id.* at 4.  He contends that he has five medical conditions that put him at "significant risk" from COVID-19: obesity, hyperlipidemia, hypertension, COPD/asthma, and prediabetes.  *Id.*  He also claims that at fifty-nine years old, his age puts him at higher risk.  *Id.* at 5.

Regarding the 18 U.S.C. § 3553(a) factors, Mr. Akerson asserts that he "was on bail for almost 6 months without incident" and "[d]uring pretrial supervision, [he] was respectful and actively engaged in the supervision process with a positive attitude."  *Id.*  He points to his "lengthy work history" and his commercial driver's license, claiming he has employment waiting for him in Newport, Maine, near his home.  *Id.* at 6.  He further argues that he "actively protected the public at significant personal risk by testifying in open court against his supplier, Myron Crosby."  *Id.* While in prison, he has "taken advantage of BOP educational opportunities" by taking classes in history, health, and anatomy.  *Id.*  He states he has served about forty-eight months of his one hundred sixty-month sentence, and with an "elderly offender

two-thirds" release date of February 3, 2026, he "can be considered to have served roughly half of his time in prison." *Id.* Finally, he states that if released, he would return home to his wife and remain on supervised release. *Id.* at 7.

In conclusion, Mr. Akerson requests compassionate release "in consideration of his at-risk medical conditions (obesity, COPD, hypertension, Asthma, and prediabetes), his age, his inability to social distance in prison, his low risk to the community, his benefit to the community as a cooperating, testifying witness, his work history, the availability of work, and his demonstrated ability to follow release conditions set by Probation and this Court." *Id.* at 8.

### B.  The Government's Opposition

The Government concedes that Mr. Akerson exhausted his administrative remedies and further recognizes that Mr. Akerson's "diagnoses of obesity and chronic obstructive pulmonary disease ('COPD') qualify as 'extraordinary and compelling reasons' warranting his release" but opposes his motion because he "remains a danger to the public and the sentencing factors set forth in 18 U.S.C. § 3553(a) weigh against release." *Gov't's Opp'n* at 1.  The Government first provides background into Mr. Akerson's offense, noting that he has served about forty-eight months of his sentence and while incarcerated "he has completed BOP educational programming" and "has a nearly unblemished disciplinary record." *Id.* at 4.  The Government reports the COVID-19 statistics at FCI Otisville and then turns to the merits of the motion. *Id.* at 6.

The Government concedes that COPD and obesity are extraordinary and compelling reasons warranting release but contends that Mr. Akerson "poses a significant danger to the safety of the community." *Id.* at 10.  The Government looks to the nature and circumstances of the offense, which it claims involved "leadership of a conspiracy to distribute and possess with the intent to distribute heroin, possession and use of firearms, and violent pistol-whipping of a co-conspirator." *Id.* at 10-11 ("He acted as the leader of a drug organization.  He arranged for out-of-state trips to procure heroin; personally went on out-of-state trips to purchase heroin; used the mails and helped purchase and register a car to be used as a means of making drug runs; illegally possessed and used firearms; and engaged in violence in connection with the drug conspiracy").  Therefore, "consideration of the § 3142(g) factors should operate to bar [Mr. Akerson's] early release." *Id.* at 11.

The Government argues the § 3553(a) factors, particularly the nature and circumstances of the offense, similarly weigh against release.  *Id.*  The Government contends that Mr. Akerson has served only "one-third of his imposed term of imprisonment" and his "trafficking of heroin as part of an interstate conspiracy continues to warrant the sentence imposed." *Id.* at 12.  Finally, the Government argues that Mr. Akerson has a "significant history of drug abuse and addiction" and enrolling in the BOP's Residential Drug Abuse Program "could prove beneficial to his prospects upon release." *Id.* at 13.

###### C.   Jamie Akerson's Reply

Jamie Akerson replies to the Government's opposition by addressing his danger to the community and the § 3553(a) factors. *Def.'s Reply* at 1. First, he states that the Court rejected a danger to the community argument in granting his pre-conviction bail in October 2016, and he then spent the next six months "with an exceptional pretrial release record." *Id.* at 1-2. He claims he "proved during pretrial release that he can abide by conditions of supervised release and, therefore, is not presently a danger to the public." *Id.* at 2. Second, he rejects the Government's argument that he does not acknowledge his role in the offense, stating that he pleaded guilty, admitted the conduct, and "was used by the government as their prime witness in their investigation against Myron Crosby." *Id.* "Without [his] cooperation," he argues "the government would never have obtained its conviction against Mr. Crosby." *Id.* Third, he addresses the COVID-19 conditions at FCI Otisville, claiming that federal prisons are "tinder boxes" for COVID-19 outbreaks and "the chances of contracting COVID-19 in Otisville are higher than they would be in Penobscot County." *Id.* at 3. Finally, he "concedes that his 160 month sentence was justified at the time it was imposed in 2018" but "with COVID risks now rendering his continued incarceration a potential death sentence, [he] has been forced to reconsider his sentence" and he "asks the Court to do the same." *Id.* at 4.

## IV.   LEGAL STANDARD

Over the course of the COVID-19 pandemic, the Court addressed the legal standard for deciding a motion for compassionate release on several occasions. *See,*

*e.g., United States v. Crosby*, 1:17-cr-00123-JAW-01, 2020 U.S. Dist. LEXIS 199085, at *16-23 (D. Me. Oct. 27, 2020).  Put succinctly, 18 U.S.C. § 3582(c)(1)(A)(i) permits a court to modify a term of imprisonment when (1) "extraordinary and compelling reasons warrant" the movant's release, (2) release is consistent with "the factors set forth in [18 U.S.C. §] 3553(a)," and (3) release comports with "applicable policy statements issued by the Sentencing Commission . . . ."  18 U.S.C. § 3582(c)(1)(A).[1]

The United States Sentencing Commission issued a policy statement under United States Sentencing Guideline § 1B1.13 for addressing compassionate release motions under § 3582(c)(1)(A).[2]  This policy statement requires that the movant must meet the "requirements of subdivision (2)," which provides that a court must determine that "the defendant is not a danger to the safety of any other person or to

---

[1]      Section 1B1.13 of the United States Sentencing Commission Guidelines addresses reductions in the terms of imprisonment under 18 U.S.C. § 3582(c)(1)(A).  But the Commission promulgated these provisions before Congress enacted the First Step Act.  *See United States v. Brooker*, 976 F.3d 228, 230-34 (2d Cir. 2020) (discussing the history of § 1B1.13 and the First Step Act).  As Judge Hornby of this District noted, the "Second, Fourth, Sixth and Seventh Circuits have . . . ruled that the Guideline policy statement applies only to motions brought by the Director of the Bureau of Prisons, not to motions for relief brought by defendants, and nothing limits judges' discretion in considering 'the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release.'"  *United States v. Almeida*, Nos. 2:17-cr-52-DBH-01, 2:11-cr-127-DBH-01, 2021 U.S. Dist. LEXIS 364, at *4 (D. Me. Jan. 4, 2021) (quoting *Brooker*, 976 F.3d at 235-37 and citing *United States v. McCoy*, 981 F.3d 271, 281-83 (4th Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1108-11 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020)); *see United States v. Gowdy*, 832 F. App'x 325, 327 (5th Cir. 2020) (describing whether § 1B1.13 applies to motions for compassionate release as an "open question"); *United States v. Pelloquin*, No. 20-12818-DD, 2020 U.S. App. LEXIS 39966, at *4 (11th Cir. Dec. 21, 2020) (characterizing the issue as "not frivolous").

[2]      As the Court has previously discussed, "[t]he Sentencing Commission promulgated this policy statement before the emergence of the COVID-19 pandemic and before the changes to § 3582 put in place by the FIRST STEP Act; its provisions are therefore not directly related to the unique circumstances presented by a global pandemic.  Nevertheless, the Court finds the policy provisions are a useful starting point for its analysis of the compassionate release motion."  *Crosby*, 2020 U.S. Dist. LEXIS 199085, at *20 n.1.  Similarly, Judge Hornby of this district has ruled that this policy statement "'provides helpful guidance' but 'is not ultimately conclusive given the statutory change.'"  *United States v. Rembert*, No. 2:12-CR-66-DBH, 2020 U.S. Dist. LEXIS 210841, at *1 (D. Me. Nov. 11, 2020) (quoting *United States v. Fox*, No. 2:14-cr-03-DBH, 2019 U.S. Dist. LEXIS 115388, at *5 (D. Me. July 11, 2019), *aff'd*, No. 19-1785 (1st Cir. July 23, 2020)).  The Court agrees.

the community, as provided in 18 U.S.C. § 3142(g)."  U.S. Sentencing Guidelines Manual § 1B1.13 cmt. n.1 (U.S. Sentencing Comm'n 2018) (U.S.S.G.).  Section 3142(g) sets forth four factors that a court must consider before releasing a person pending trial.  They include: (1) the nature and circumstances of the offense, specifically whether the crime is a crime of violence or involves a controlled substance; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.  18 U.S.C. § 3142(g).

The policy statement also provides criteria for determining whether "extraordinary and compelling reasons" exist to release the defendant.  U.S.S.G. § 1B1.13 cmt. n.1.  These reasons include certain enumerated terminal illnesses and similar conditions, physical, functional, mental, or cognitive impairments, age, family circumstances, and other unenumerated reasons.  *Id.* § 1B1.13 cmt. n.1 (A-D).  The policy statement further provides that "an extraordinary and compelling reason need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment."  *Id.* § 1B1.13 cmt. n.2.  Finally, it states that "[p]ursuant to 28 U.S.C. § 994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement."  *Id.* § 1B1.13 cmt. n.3.

The movant bears the burden of proving that he is entitled to a sentence reduction, and "the Court has broad discretion in deciding whether to grant or deny a motion for sentence reduction."  *United States v. Curtis*, No. 1:14-cr-00140-JAW,

15

2020 U.S. Dist. LEXIS 102045, at *12 (D. Me. June 11, 2020) (quoting *United States v. Britton*, 473 F. Supp. 3d 14, 16 (D.N.H. 2020) (internal citations omitted)).

## V. DISCUSSION[3]

The Court reviewed Mr. Akerson's motion along with the Government's response and the applicable law. The Court finds that Mr. Akerson's medical conditions may place him at higher risk from COVID-19, but in light of his recent vaccination and the ongoing vaccination of others at FCI Otisville, Mr. Akerson has failed to carry his burden of showing extraordinary and compelling reasons exist to warrant his release. Additionally, the Court concludes that the nature of Mr. Akerson's offense, the relatively short time he has served in relation to his one hundred sixty-month sentence, and the need for the sentence imposed to deter him and others similarly situated tip the scales against release.

### A. Extraordinary and Compelling Reasons

To grant Mr. Akerson's motion under 18 U.S.C. § 3582(c)(1)(A)(i), the Court must find "extraordinary and compelling reasons warrant[ing]" a reduction in sentence. According to the Centers for Disease Control and Prevention (CDC), there are several factors that increase a person's risk of severe illness from COVID-19.

Arguably, the most decisive factor is a person's age. *Older Adults*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-

---

[3] 18 U.S.C. § 3582(c)(1)(A) contains a mandatory claim processing rule, which bars some compassionate release motions as untimely. *See Crosby*, 2020 U.S. Dist. LEXIS 199085, at *17 (citing *United States v. Lugo*, No. 2:19-cr-00056-JAW, 2020 U.S. Dist. LEXIS 63673, at *3 (D. Me. Apr. 10, 2020)). The Government "concedes that [Mr. Akerson] has exhausted the applicable administrative process prerequisite to filing the Motion . . . ." *Gov't's Opp'n* at 1. The Court agrees.

adults.html (last visited May 10, 2021). Generally, the risk of COVID-19 increases as a person ages, and over eighty percent of deaths occur in people who are sixty-five or older. *Id.* The age-related risk does not disappear when someone is younger than sixty-five. *See id.* (Table entitled "Risk for COVID-19 Infection, Hospitalization, and Death By Age Group"). Thus, even though at age fifty-nine Mr. Akerson is not in the highest risk group, he is more likely than someone younger to require hospitalization or suffer other serious complications, including death, from COVID-19.

People with certain medical conditions may be at high risk of getting seriously ill if they contract COVID-19. The CDC guidelines list a number of medical conditions that "can make [a person] more likely to get severely ill from COVID-19." *People with Certain Med. Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited May 10, 2021) (*CDC COVID Med. Conditions*). By contrast, the CDC lists only one condition, pregnancy, that it says is—as opposed to can be—more likely to make a person severely ill from COVID-19. *Id.* The Court assesses Mr. Akerson's underlying medical conditions against the most recent CDC guidance.

Mr. Akerson asserts five medical conditions that he claims put him at significant risk from COVID-19: (1) obesity, (2) hyperlipidemia, (3) hypertension, (4) COPD/asthma, and (5) prediabetes. *Def.'s Mot.* at 4. Mr. Akerson's most recent medical records from January 21, 2021 provide evidence of each of these conditions. *Id.*, Attach. 3, *BOP Health Services, Clinical Encounter* at 2 (*BOP Health Records*). Thus, the Court accepts that Mr. Akerson does, in fact, suffer from those conditions.

17

According to the CDC, being overweight or obese can make it more likely that a person will get severely ill from COVID-19. *CDC COVID Med. Conditions*. The CDC notes that the "risk of severe COVID-19 illness increases sharply with elevated BMI." *Id.* The CDC defines "obesity" as a body mass index (BMI) of more than 30 and less than 40 kg/m² and "severe obesity" as a BMI of more than 40 kg/m². *Id.* The CDC defines "overweight" as a BMI more than 25 and less than 30 kg/m². *Id.* BOP records show that on January 21, 2021, a doctor diagnosed Mr. Akerson with "obesity," *BOP Health Records* at 2, and a clinical encounter on May 5, 2020 measured his BMI at 34.5. *Def.'s Mot.*, Attach. 2, *BOP Health Services, Clinical Encounter* at 26. Thus, the Court accepts that Mr. Akerson is obese and therefore may be more likely to get severely ill from COVID-19.

Mr. Akerson next complains of hyperlipidemia, but the CDC does not list hyperlipidemia as a condition that can make someone more likely to get severely ill from COVID-19. Without more information, the Court cannot assess how hyperlipidemia increases his risk from COVID-19.

According to the CDC, people with heart conditions can be more likely to get severely ill from COVID-19. *CDC COVID Med. Conditions*. However, specifically for hypertension, the CDC says that high blood pressure is "possibly" a condition that can make a person more likely to get severely ill from COVID-19. From the Court's reading, the CDC compounds possibilities for hypertension, lessening its risk factor. The CDC says that hypertension is possibly a condition that *can* make a person severely ill from COVID-19. *Id.*

Next, the CDC states that "chronic lung diseases," including "chronic obstructive pulmonary disease (COPD)" and "asthma (moderate-to-severe)," can make a person more likely to get severely ill from COVID-19. *Id.* Accepting that Mr. Akerson suffers from COPD, the Court finds that he may be at higher risk from COVID-19.

Finally, the CDC advises that "having either type 1 or type 2 diabetes can make [a person] more likely to get severely ill from COVID-19." *Id.* Mr. Akerson, however, only claims to be "prediabetic." Nothing in the CDC's guidance suggests that prediabetes can increase a person's risk from COVID-19, and thus the Court cannot assess to what degree prediabetes increases his risk from COVID-19.

The Government "concedes that [Mr. Akerson] offers 'extraordinary and compelling' reasons warranting compassionate release due to his obesity and COPD." *Gov't's Opp'n* at 9. The Government, however, "does not concede that [Mr. Akerson's] diagnoses make it more likely that he will contract COVID-19 while in BOP custody." *Id.* at 10 n.6. The BOP website describes FCI Otisville as a "medium security federal correctional institution with an adjacent minimum security satellite camp and a detention center." *FCI Otisville*, BOP, https://www.bop.gov/locations/institutions/otv/ (last visited May 10, 2021). There are 583 total inmates, with 522 at the FCI and FDC and 61 at the Camp. *Id.*

Mr. Akerson's risk of contracting COVID-19 is reduced because of the ongoing vaccination program at FCI Otisville. According to the BOP, it has fully inoculated 113 staff members and 347 inmates at FCI Otisville. *COVID-19 Coronavirus*, BOP,

https://www.bop.gov/coronavirus/ (last visited May 10, 2021).  The latest COVID-19 statistics from FCI Otisville are less encouraging.  The BOP website lists thirty-six inmates and two staff members as having tested positive for COVID-19.  *Id.*  No inmates or staff have died.  *Id.*  Fifty-seven inmates and thirty-six staff have recovered from COVID-19.  *Id.*

Mr. Akerson's risk of serious illness from COVID-19 is further reduced significantly by his vaccination.  Mr. Akerson confirmed that he received the first dose of the Pfizer vaccine on March 30, 2021 and was scheduled to receive the second dose on April 20, 2021.  *Vaccine Status Update*.  Although the Court has not received confirmation from either party that Mr. Akerson actually underwent the second vaccine as scheduled, in this circumstance, the Court infers that he must have received the booster shot as scheduled.  If so, according to the CDC, as of May 4, 2021, Mr. Akerson was fully vaccinated—two weeks after his second dose.  *When You've Been Fully Vaccinated*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated.html (last visited May 10, 2021).

COVID-19 vaccines have proven to be extremely effective.  In particular, the Pfizer-BioNTech vaccine is proven to be "95% effective at preventing laboratory-confirmed COVID-19 illness in people without evidence of previous infection."  *Pfizer-BioNTech COVID-19 Vaccine Overview and Safety*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/different-vaccines/Pfizer-BioNTech.html (last visited May 10, 2021).  While the vaccines are not one hundred percent effective, the CDC unequivocally says, "COVID-19 vaccines are effective at

preventing COVID-19 disease, especially severe illness and death." *When You've Been Fully Vaccinated*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated.html (last visited May 10, 2021).

The Court agrees with Judge Walker of this District, who recently concluded that a fully vaccinated inmate's risk of serious illness from COVID-19 is "substantially reduced, based on publicly available information provided by the [CDC]." *United States v. Pignatello*, No. 1:19-cr-68-LEW, 2021 U.S. Dist. LEXIS 70677, at *2 (D. Me. Apr. 13, 2021). This conclusion is in line with the vast majority of other courts that have concluded "the highly effective available vaccines dramatically affect whether an inmate's medical conditions constitute the 'extraordinary and compelling reason' required to further consider compassionate release." *United States v. Sanders*, Crim. Case No.: SAG-06-087, 2021 U.S. Dist. LEXIS 72967, at *8 (D. Md. Apr. 15, 2021) (collecting cases).

Mr. Akerson moves for compassionate release solely "due to heightened COVID-19 risks associated with [his] multiple comorbidities." *Def.'s Mot.* at 1. Now that he is vaccinated, those risks are greatly reduced. In light of his vaccination and the ongoing vaccination of others at FCI Otisville, the Court concludes Mr. Akerson failed to carry his burden of proving extraordinary and compelling reasons warranting release.

## B. Danger to the Community

Notwithstanding the Court's finding regarding any extraordinary and compelling reasons for Mr. Akerson's release, the Court concludes Mr. Akerson is a

danger to the community and will not release him. The Court primarily rests this finding on two considerations. First, Mr. Akerson's offense of conviction. 18 U.S.C. § 3142(g) instructs a court to consider "the nature and circumstances of the offense charged, including whether the offense . . . involves a . . . controlled substance [or] firearm." Mr. Akerson's offense involved both. Mr. Akerson was the leader of a conspiracy to import and distribute heroin from out-of-state, and the Court held Mr. Akerson accountable for over eight thousand grams of heroin in less than a year's time. He purchased a car for others to make heroin resupply trips and personally went on trips to purchase heroin. He engaged in violence when he violently pistol-whipped his primary co-conspirator Mr. Shorey on the head.

Mr. Akerson's offense also involved firearms. As a convicted felon, Mr. Akerson was not able to legally purchase firearms, so he employed Mr. Shorey to buy guns for him. There is no evidence that Mr. Akerson used the firearms, other than to pistol-whip his drug-dealing partner, but the combination of drugs and guns is a recipe for disaster. The Court recently found his co-conspirator Todd Shorey posed a danger to the community because of his role in the drug conspiracy. *United States v. Shorey*, No. 1:16-cr-00130-JAW-2, 2021 U.S. Dist. LEXIS 65779, at *24-26 (D. Me. Apr. 5, 2021). As the leader of the drug conspiracy, Mr. Akerson poses an even greater danger.

The Court is also concerned by Mr. Akerson's history and characteristics. 18 U.S.C. § 3142(g)(3). Mr. Akerson's life has been defined by a long and largely uninterrupted pattern of criminal activity. According to the PSR, which the Court

relied on at sentencing, from age eighteen until his arrest for the federal offense at age fifty-four, Mr. Akerson was convicted twenty-two times.  This persistent pattern of criminal conduct landed Mr. Akerson in Criminal History Category VI. Mr. Akerson argues that the Court granted him pretrial release and he abided by his bail conditions for six months without incident.  *Def.'s Mot.* at 5.  Given his extensive criminal history spanning decades, the Court is not persuaded by Mr. Akerson's short six-month period of good behavior while on pretrial release.

Furthermore, it does not appear that Mr. Akerson has fully addressed his drug addictions.  In the PSR, Mr. Akerson reports a lengthy history of substance abuse, most recently daily using heroin and crack cocaine until his arrest.  *PSR ¶¶* 68-70. In his reply brief, Mr. Akerson cites the PSR, stating that he "became involved in the offense in order to support his drug habit and 'bring more money into the house.'" *Def.'s Reply* at 2 (citing *PSR ¶* 16).  In spite of this admitted history of substance abuse, Mr. Akerson claims he has "no interest" in the BOP's drug abuse program because that program is "for inmates still using drugs" and he claims he "does not have an active addiction and is uncomfortable keeping company with those inmates who do."  *Id.* at 6 n.13.  This Court recommended Mr. Akerson for enrollment in the BOP's five hundred-hour Residential Drug Abuse Program (RDAP) and imposed special conditions targeting his history of substance abuse.  *J.* at 2, 5.  Mr. Akerson admits that his serious federal offense was fueled in part by his drug addiction, and the Court is concerned that if Mr. Akerson does not address his substance abuse he will recidivate.  *See United States v. Greenlaw*, No. 1:18-cr-00098-JAW-06, 2020 U.S.

23

Dist. LEXIS 182521, at *26-28 (D. Me. Oct. 2, 2020) (considering inmate's failure to address his substance abuse as relevant to his risk of recidivism and danger to the community). Consistent with this Court's opinion in *Greenlaw* and the United States Supreme Court in *Tapia v. United States*, 564 U.S. 319 (2011), the Court does not rely solely on Mr. Akerson's lack of drug treatment but merely considers it as one factor among others in ruling on Mr. Akerson's motion.

Mr. Akerson asserts that while in prison he has "taken advantage of BOP educational opportunities, taking classes in history, health, and anatomy." *Def.'s Mot.* at 6 (internal citations omitted). The Court encourages Mr. Akerson to continue his efforts at self-improvement. However, at this time, Mr. Akerson affords the Court no grounds on which it may conclude that releasing him would not jeopardize the public safety. Thus, the Court concludes that Mr. Akerson is a danger to the community and releasing him would contravene 18 U.S.C. § 3142(g).

### C.     The Section 3553(a) Factors

Finally, the Court must consider the factors set forth in 18 U.S.C. § 3553(a). The Court concludes those factors weigh against release. The Court has given particular weight to the serious nature and aggravating circumstances of Mr. Akerson's offense, as well as his history and characteristics. The Court will not repeat its description of the offense conduct but concludes that leading a drug trafficking organization that imported enormous amounts of heroin from out-of-state, illegally obtaining firearms in furtherance of drug trafficking, and engaging in violence does not support early release. Mr. Akerson's extensive criminal history also

weighs against release.  Furthermore, the sentence must afford adequate deterrence. This includes both specific deterrence—that is, the need for Mr. Akerson to serve a sentence long enough to deter his own criminal conduct—as well as general deterrence, the need to deter others.  Particularly in instances like this, where the defendant is involved in a drug trafficking conspiracy, a substantial sentence is necessary to reflect the seriousness of the offense and to prevent others from engaging in similar criminal conduct.

Mr. Akerson highlights his role in the prosecution of Myron Crosby, claiming that he "protected the public at significant personal risk." *Def.'s Mot.* at 6.  The Court recognized his "substantial assistance to the government in the investigation and prosecution of others" and departed far below the guideline range of three hundred sixty months to life, imposing a one hundred sixty-month sentence.  *Statement of Reasons* at 2.  The Court reasoned that this sentence was "sufficient but no greater than necessary."  The Court reviewed its prior determination and reaffirms it in full. The Court received no new information that would alter its reasoning at the time of his sentencing hearing.  The Court only adds that Mr. Akerson has been incarcerated for just 36% of his statutory term and 31% of his full term of imprisonment.  Early release would fail to reflect the seriousness of the offense, promote respect for the law, provide just punishment, or afford adequate deterrence.

### D.    Summary

Mr. Akerson has not carried his burden of proving entitlement to compassionate release.  While obesity and COPD can increase the risk of serious

complications from COVID-19, he is now vaccinated and so his risk of serious illness from COVID-19 is substantially reduced.   Furthermore, given the nature and circumstances of his offense, releasing Mr. Akerson early would endanger the community and contravene the § 3553(a) factors.  The Court wishes Mr. Akerson the best and fully expects that he will return to society a productive and law-abiding citizen.   On the record before the Court, however, he does not qualify for compassionate release under 18 U.S.C. § 3582(c).

## VI.    CONCLUSION

The Court DISMISSES without prejudice Jamie Akerson's Amended Petition for Compassionate Release (ECF No. 190).


SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 10th day of May, 2021